

PATRICIA HARGRAVE,                    )
                                      )
                 Plaintiff,           )      Case. No. 06 C 5563
        v.                            )
                                      )      Magistrate Judge
MICHAEL J. ASTRUE, Commissioner       )      Arlander Keys
of Social Security,                   )
                                      )
                 Defendant.           )

## MEMORANDUM OPINION AND ORDER

Plaintiff Patricia Hargrave filed this lawsuit seeking review of the decision of the Commissioner of Social Security (the "Commissioner") to deny her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The case is currently before the Court on cross motions for summary judgment: Ms. Hargrave asks the Court to reverse the Commissioner's decision and/or remand the matter; the Commissioner asks the Court to affirm the decision denying benefits. For the reasons set forth below, the Court grants the Commissioner's motion and denies Ms. Hargrave's motion.

## FACTS AND PROCEDURAL HISTORY

On January 13, 2003, Patricia Hargrave, then 51 years old, filed an application for Disability Insurance Benefits; in that application, she claimed that she had been unable to work as of February 16, 2001 due to "status post back surgery, hypertension, rectal bleeding, upper respiratory infections (constant)." Record at 120-123. The SSA denied her application

initially and on reconsideration because it determined that, although these conditions did cause some restrictions in her ability to function, they did not prevent her from returning to work as a customer service representative, the last job she held. Record at 110-119. Ms. Hargrave requested a hearing before an Administrative Law Judge, and ALJ Helen Cropper held the requested hearing on April 12, 2005.[1]

At the hearing, the ALJ heard from Ms. Hargrave, who was represented, and she also heard from a Vocational Expert. Ms. Hargrave testified first. She testified that she is single and lives with her sister in her late mother's house; she testified that, at the time of the hearing, the house was in foreclosure because her sister had taken out a loan on the property and been unable to make the payments on the loan. R. at 361-362. She testified that she is not working and has no other source of income; she testified that she receives $149 per month in food stamps. R. 362. She testified that, before her death, her mother took care of her financially and paid all the bills in the house.

With regard to her medical history, Ms. Hargrave testified that she sought treatment for her lower back pain initially from

---

[1]Ms. Hargrave executed a request for a hearing on October 4, 2003 and the SSA received that request on October 31, 2003. Yet, for some reason, the notice scheduling the hearing didn't go out until February 24, 2005. This sixteen-month delay is unexplained in the record.

2

her regular doctor, Dr. Hillary Johnson; she testified that Dr. Johnson then referred her to an orthopedic surgeon, who performed surgery in July 2002. She testified that she was, at least initially, asymptomatic post-surgery. R. at 396-97, 400-01. She testified that she had one follow up appointment with the orthopedic surgeon and then went to see Dr. Johnson a few times in 2003. She testified that, at that time, she was having back pain and bleeding, and that her doctor prescribed vicodin. R. at 401. She testified that, after her insurance lapsed in 2003, she did not seek regular treatment for her back; she testified that she went to the emergency room at Cook County Hospital on two occasions and waited for several hours but left without being treated. Record at 403. She testified that she cannot afford to seek medical care and cannot afford prescription medication. Record at 407-08. She testified that she has back pain every day. Record at 409. She also testified that she takes motrin and tylenol every day and occasionally takes her sister's ibuprofen (three or four times a month). Record at 410. She testified that she does exercises, which she learned in physical therapy, and she also takes hot baths or uses a heating pad. Record at 410-411. She testified, however, that although the medication helps "a little," the only thing that really made the pain go away was the vicodin, and she stopped taking those

because she did not want to become addicted to them. Record at 416.

With regard to her education, Ms. Hargrave testified that she went to Chicago State University for 2 years, where she studied special education and finance. R. at 365-66. She testified that she did not receive a degree from Chicago State. R. 366. She also testified that she attended "American Banking Financing," where she received training in financing, bookkeeping, data entry, micro-encoding, customer service and tellering. R. at 365-66.

With regard to her work history, Ms. Hargrave testified that she last worked in 2000, as a customer service representative for Information Resource, or IRI Holdings; she testified that the job involved conducting telephone surveys, but also involved lifting call logs and binders, which weighed up to 10 or 15 lbs. R. at 368, 370-71. She testified that she left that job because she was experiencing pain. R. at 371.

Prior to working at IRI, Ms. Hargrave worked as a teller at Harris Bank; she testified that she had difficulty performing that job because lifting bags of coins caused her pain and because she was required to get up and down to deal with the chutes for the drive-up teller window. R. at 373. She testified that she left the job at Harris, which was arranged through a

4

temp agency, because she was offered the permanent job with IRI; she testified that she "needed the benefits." R. at 374.

She testified that, prior to the Harris job, she worked as a receptionist and secretary for a community organization called "Save Our Neighborhood"; she testified that the job involved filing and writing letters, and keeping notes from meetings; she testified that the job also required her to go out into the community, to visit schools, and that this last aspect of the job caused her difficulty, given that it is hard for her to walk. She testified, however, that she left the job because the grant for her position ended. R. at 375.

Ms. Hargrave testified that she also worked for Bank One, performing data entry; she testified that the job involved a combination of sitting and standing, lifting and carrying trays of invoices weighing 15 to 30 pounds. R. at 376. She testified that she left Bank One when the bank learned that she was related to another woman in the department, which violated company policy. R. at 377.

Ms. Hargrave testified that her first job was at American National, where she did micro-encoding; she testified that she worked in that job for eight years. R. at 378. She also testified that she worked for LaSalle Bank for nine years, initially handling mail teller clerk duties and Armored Car transfers. R. at 380-81. She testified that she sometimes had

5

trouble lifting the bags from Illinois Armor; however she testified that she left that job because she was offered a higher-paying job at Bank of America. R. at 382. Ms. Hargrave testified that, after LaSalle, she went to work for Bank of America as a senior operational manager, overseeing approximately 60 employees in the bank's lock box department. R. at 382-83. Ms. Hargrave testified that, as a supervisor, she was charged with hiring, firing, evaluating and disciplining employees and setting work schedules, but she also performed the regular floor work of a lock box employee, including data entry and micro-encoding. R. at 383-84. She testified that she left that job because it became too stressful. R. at 385.

After leaving Bank of America, Ms. Hargrave joined Talent Tree, a temp agency, which placed her on jobs at various financial institutions including American Express, Household Financing and Harris Bank; in those positions she did data entry and micro-encoding work. *Id.* at 386.

After Talent Tree, she went to work for Mellon Financial Services, again working as a mail teller and a micro-encoder; she worked at Mellon during part of 1994 and part of 1995. R. at 387. She testified that she left Mellon because it was too far from home, and then accepted the job at Bank of America. R. at 387-88.

Ms. Hargrave testified that she has not worked since 2001, but that she has continued to look for work in banks since that time; she testified that she has not been offered any positions and that she does not think she is capable of working now anyway. R. at 391-92. Specifically in this regard, she testified that she "can't sit a long period of time, I can't stand. I can barely walk a block. Like now I'm in pain, and the only way I can relieve this pain is to do what they asked me to do as far as physical therapists and stuff. And she told me that I would have to do this every 15, 20 minutes every hour. No job is going to let me do that." R. at 392.

With regard to her daily living activities, Ms. Hargrave testified that she wakes up about 5:30 or 6:00 each day, has breakfast with her sister (which her sister fixes) and then washes the dishes and does some light work around the house (she dusts, cleans the sink, cooks lunch and just generally straightens up; she cannot vacuum, mop or do laundry); she testified that she basically just sits around, talks to her sister when she is home from work, and naps. Record at 418-20. She testified that she enjoys reading, she occasionally watches a little tv and goes to church. Record at 421-23. She testified that she has a valid driver's license, but that she rarely drives because she's afraid to, given that she suffers swelling and paralysis in her right foot and hand. R. at 367-68. She

testified that she is afraid to go out by herself because she fears that she will lose her equilibrium and fall. Record at 422.

Ms. Hargrave testified that she thinks she can comfortably lift no more than 10 pounds using both hands. Record at 423. She testified that she can stand still for only about 5 or 10 minutes; that she can walk only about half a block comfortably; that she can sit for only about 30 minutes before the pain becomes excruciating; she testified that she has to get up and lean on a surface, that good posture hurts. Record at 424-25. She testified that, when her hands are swollen, she has trouble writing. Record at 426. She testified that she is able to brush her teeth, but that she is not able to bend over to tie her shoes. Record at 426.

After Ms. Hargrave, the ALJ heard from a vocational expert, who had been present during and attentive throughout Ms. Hargrave's testimony. The VE summarized Ms. Hargrave's past work as follows:

> [t]he claimant has worked in customer service for Information Resource, and the nature of her duties and responsibilities indicate that that is skilled work and sedentary in nature. The work as data entry worker at several banks is skilled, sedentary as it's typically performed in the national economy. The third occupation is that of a teller. That's considered light and skilled. The Claimant also did what is called micro encoding which is a specialized type of data entry in banking, skilled and sedentary. The work as a senior operations manager processing deposits for a lock box is - in the banking industry - it's

8

supervising the micro encoding and data entry and the
Claimant indicated she was a working supervisor in
addition to supervising employees doing performance
appraisals, evaluation, scheduling, hiring and firing,
skilled and light exertion. And the work that she did
for the community organization is what I would call a
hybrid job that involved some community representation
to the schools, receptionist work and secretary. The
duties ranged from sedentary to light and the work is
skilled.

Record at 430-31. The VE then testified in response to
hypotheticals posed by the ALJ. First, she testified that
someone with Ms. Hargrave's past relevant work experience who was
within a month of her 53rd birthday, had a high school education
and three years of post-secondary education, could never climb
ladders, ropes or scaffolds or work on moving or unstable
surfaces, could occasionally climb ramps or stairs, stoop, kneel,
crouch or crawl, and should not be exposed to unprotected heights
or unguarded hazardous equipment, could perform all of Ms.
Hargrave's past relevant work. Record at 431-32. The VE
testified that, if the hypothetical claimaint were limited to
performing work at the sedentary level, some of the past work
would be precluded; she testified that the supervisor and the
teller positions, which are considered light level, would be out,
but that the claimant could still perform the remainder of the
past relevant work. Record at 432. Additionally, the VE
testified that Ms. Hargrave's past relevant work involved skills
that were transferable to a significant number of other jobs,
both at the light exertional level and the sedentary exertional

9

level, existing in significant numbers in the regional economy. Record at 433-34.

With regard to time on task, the VE testified that an employee can have some "downtime," some diminution in persistence, pace, attention and concentration, and still sustain competitive employment; she testified, however, that if an employee falls below a threshold of 80% - that is, if an employee is off-task more than 20% of the workday - she would not be "a suitable candidate for competitive employment." Record at 435. She testified that an employee who was off task two-thirds of the workday would essentially be unemployable. Record at 435.

In addition to the testimony, the ALJ considered documentary evidence. The record as it existed at the time of the hearing, included progress notes showing that Ms. Hargrave saw Dr. Johnson with some regularity from February 21, 2001 through September 15, 2003. Record at 254-284. According to those notes, Ms. Hargrave complained about lower back pain and/or lumbar tenderness during the months leading up to her July 16, 2002 surgery. After the surgery, at a visit on August 5, 2002, she reported that her back felt "better." Record at 269. But by November 25, 2002, she was complaining of back pain again after apparently falling. Record at 271. By February 2003, Ms. Hargrave reported that she "generally feels well." Record at 279. She had a colonoscopy on December 31, 2002; hemorrhoids were identified, but the exam was

10

otherwise normal. Record at 281. By June 11, 2003, Ms. Hargrave was again complaining about severe back pain; she reported that she was unable to bend over to tie her shoes and that it hurt to walk. Record at 282. She complained of back pain at appointments in July and September 2003. Record at 283-284. And then it appears that she stopped seeing Dr. Johnson. This would be consistent with Ms. Hargrave's testimony that she stopped treatment when her insurance lapsed.

In addition to the records documenting Ms. Hargrave's visits to Dr. Johnson, the record includes a report from an MRI done on April 30, 2001. According to that report, Ms. Hargrave was referred by Dr. Johnson because of low back pain and right foot numbness; the MRI revealed "spinal stenosis on a degenerative basis being mild at L3-4, severe at L4-5 and moderate at L5-S1." Record at 243. There is also a report from an October 30, 2001 radiology examination; according to that report, Ms. Hargrave presented with "spondylolisthesis with moderate spinal stenosis at the L4-5 level. There is also associated disk herniation posteriorly and centrally with some extrusion superiorly"; the report also noted "degeneration of L5-S1 disk with bulging annulus and hypertrophic changes causing narrowing of the lateral recess and faramina." Record at 244.

Also included were records from Ms. Hargrave's back surgery on July 16, 2002. According to those records, Ms. Hargrave came

11

to the surgery with "severe lumbar arthritis and disk disease" and "severe spinal stenosis"; she left the hospital with a walker and a prescription for physical therapy. Record at 216

The record before the ALJ also included reports from doctors who examined Ms. Hargrave at the behest of the SSA. First, the record shows that Ms. Hargrave underwent an internal medicine consultative examination on April 3, 2003, a few months after filing her application for benefits. At that time, Ms. Hargrave complained of "recurrent, mild to moderate pain in the low back area"; she stated that the pain and stiffness worsens with prolonged standing, sitting and walking" and reported "difficulty with bending and lifting," as well as "mild numbness in the right leg from time to time." Record at 249. According to the examination report, Ms. Hargrave had recently been diagnosed with high blood pressure, but had no specific complaints relating to that condition; she complained of recurrent rectal bleeding from hemorrhoids and she reported suffering from recurrent upper respiratory infections and sinus problems. Record at 249. The consulting physician noted that Ms. Hargrave was "mildly uncooperative for ROM evaluation" and that the noted limitations were, therefore, quantified; he noted no deformity, swelling, tenderness or redness of any joint, and he noted that her gait was normal, without any assistive devices. Record at 251.

The record also includes a Physical Residual Functional
Capacity Assessment dated April 18, 2003. Record at 193-200.
According to that assessment, Ms. Hargrave's conditions gave rise
to a variety of exertional limitations: she could lift 20 lbs.
occasionally and 10 lbs. frequently; she could stand or walk 6
hours in an 8-hour workday, and sit about 6 hours in an 8-hour
workday. They also gave rise to one environmental limitation:
she should avoid concentrated exposure to fumes, odors, dusts,
gases, poor ventilation, etc. She had no postural, manipulative,
visual or communicative limitations. The ultimate assessment was
that Ms. Hargrave was "capable of performing at the level of
light work activity." Record at 200.

Ms. Hargrave was next examined by a consultative doctor, Dr.
Pascal Bordy, on October 15, 2004. According to Dr. Bordy's
report, Ms. Hargrave reported having "constant moderate to severe
localized low back pain graded nine out of ten". Record at 311.
Dr. Bordy noted Ms. Hargrave's limitations as follows: she was up
to 20% reduced in her ability to travel; she was 20-50% reduced
in her ability to walk, stand, stoop, sit, turn, push and pull;
she was more than 50% reduced in her ability to bend and climb;
she could lift no more than 10 lbs. at a time; and she was
moderately limited in her activities of daily living. Record at
310.

13

At the hearing on April 12, 2005, after the live testimony was completed, the ALJ advised Ms. Hargrave and her representative that she wanted them to request and submit any emergency room visit records that were not yet part of the record; she also asked Ms. Hargrave "to agree to an orthopedic consultative exam with an x-ray of her back and an RFC opinion." Record at 436. From the record, it appears that Ms. Hargrave underwent the orthopedic consultative examination on September 22, 2005, and that records were forwarded to the ALJ as discussed. Record at 338-341. According to that exam, performed by Dr. Richard Shermer, an orthopedic surgeon, Ms. Hargrave reported "persistent pain in the lower back with very limited endurance for walking"; she is "able to walk without devices, but limited"; she "[has] pain with lumbar flexion and extension maneuvers"; and she "is able to sit and stand, but requires assistance in doing so." Record at 341. According to Dr. Shermer, Ms. Hargrave could lift 20 lbs. occasionally and less than 10 lbs. frequently; she could stand and/or walk at least 2 hours in an 8-hour workday and sit less than about 6 hours in an 8-hour workday; she had limited ability to push and pull in her lower extremities and was limited in her ability to climb, balance, kneel, crouch, crawl and stoop. Record at 342-343.

Finally, the record includes a Physical Capacities Evaluation completed by Erin Shawn, a nurse practitioner, on

November 14, 2005. Record at 348-351. According to that evaluation, Ms. Hargrave: could sit, stand and walk less than 1 hour in an 8-hour workday; required an opportunity to alternate sitting and standing at will throughout the day; could perform simple grasping, pushing and pulling and fine manipulation, but could not use her hands for repetitive motion tasks; and could not use her feet for repetitive movements. Record at 348. Ms. Shawn reported that Ms. Hargrave could occasionally lift or carry up to 5 lbs., but could never lift more than that; nor could she ever climb, balance, stoop, kneel, crouch, crawl or reach above shoulder level; nor could she handle unprotected heights, moving machinery, marked changes in temperature and humidity, driving automotive equipment or exposure to dust, fumes and gases. Record at 349. Finally, Ms. Shawn noted that Ms. Hargrave complained of pain that was severe and disabling in that it prevented her from working full-time and caused her to experience deficiencies of attention and concentration. Record at 350.

The same day Ms. Shawn completed her assessment, Ms. Hargrave filed an application for Supplemental Security Income (SSI). Additionally, while the record before the ALJ remained open, Ms. Hargrave's representative forwarded to the ALJ a letter stating that, during the course of a medical work-up on July 18, 2005, Ms. Hargrave was diagnosed with Non-insulin Dependent Diabetes Mellitus. Record at 71.

15

On January 13, 2006, after hearing from Ms. Hargrave, her representative and the VE, and after reviewing the medical evidence included in the record, the ALJ issued a decision denying Ms. Hargrave's claim for benefits. In so doing, the ALJ noted that Ms. Hargrave had not performed substantial gainful activity, and that she was obese and suffered from lower back pain and diabetes mellitus, but that her impairments did not meet or medically equal a listed impairment. The ALJ then determined that Ms. Hargrave had the residual functional capacity to perform almost the full range of sedentary work. In making this determination, the ALJ acknowledged that there was not much in the way of objective medical evidence to substantiate Ms. Hargrave's disability claim, and that, as a result, the determination turned, to a substantial degree, on Ms. Hargrave's description of her symptoms and abilities, and the ALJ's evaluation of her credibility in so describing. For reasons she carefully explained, the ALJ concluded that she could not fully credit Ms. Hargrave's claim that she is disabled by her back pain and other conditions. She then adopted the testimony of the VE and found that Ms. Hargrave had the RFC to perform and sustain her past relevant work as a customer service clerk, a bank encoder or data entry clerk and a secretary/receptionist. She also found that Ms. Hargrave possessed skills that could be

transferred to other semi-skilled sedentary jobs existing in significant numbers in the regional economy. The ALJ therefore concluded that Ms. Hargrave was not disabled within the meaning of the Act and denied her claim for benefits.

Ms. Hargrave, still represented by counsel, asked the Appeals Council to review the ALJ's January 13, 2006 unfavorable decision. Along with the request for review, Ms. Hargrave submitted additional evidence, including treatment records from Dr. Christopher DeWald of Fantus Clinic and two preliminary radiology exam reports dating from after the hearing. Record at 35-45. Thereafter, Ms. Hargrave supplemented the record before the Appeals Council to add final versions of the previously submitted radiology reports, see Record at 33-34, as well as records from Chicago Family Health Care and the Pain Management Center at Stroger Hospital, see Record at 6-30.

On September 8, 2006, the Appeals Council denied Ms. Hargrave's request for review. Record at 3. She filed this lawsuit on October 13, 2006. The parties then filed motions for summary judgment, which have now been fully briefed.

## Discussion

An individual claiming a need for DBI or SSI must prove that she has a disability within the meaning of the Social Security Act. Eligibility for benefits is determined, under the social security regulations, using a five-step, sequential analysis.

17

First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his or her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision to deny benefits must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir.

18

2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may meaningfully review the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if, because the decision is not sufficiently articulated, meaningful review is not possible, the Court must remand. *Id.*

Ms. Hargrave argues that the ALJ's decision was erroneous for three reasons: first, she argues that the ALJ, having ordered a consultative examination and x-rays, was wrong to proceed to decision without the benefit of those x-rays; second, she argues that the ALJ claimed to credit certain RFC assessments over others, yet ultimately adopted an RFC assessment that was inconsistent with the assessments she claimed to credit; and third, she argues that the ALJ erred in adopting the VE's testimony in response to a posed hypothetical that did not include all of Ms. Hargrave's limitations. Additionally, Ms. Hargrave argues that remand is warranted based upon new and material evidence obtained after the date of the hearing.

## The ALJ's Request for X-Rays

Ms. Hargrave first argues that the ALJ was wrong to issue her decision without having received new x-rays. Without question, the ALJ has a duty to develop the record, even when, as here, the claimant is represented by counsel. *See, e.g., Hannum v. Barnhart*, No. 1:04-CV-1445-DFH-TAB, 2005 WL 1799433, at *9 (S.D. Ind. July 27, 2005)(citing *Ray v. Bowen*, 843 F.2d 998, 1006 (7th Cir. 1988)). The Seventh Circuit has instructed that courts are to "defer to the ALJ's 'reasoned judgment' on how much evidence to collect in assessing a claim of disability." *Id.* (*citing Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994)). And it has cautioned courts to recognize that "insistence on a truly 'complete' record would be a formula for paralysis that would conflict with the design for relatively informal hearings in which the ALJ has a partially inquisitorial role"; "if the ALJ is able to weigh the record evidence and determine whether the claimant is disabled based on that evidence, then she is not required to obtain additional evidence." *Id.* (citing *Smith v. Apfel*, 231 F.3d 433, 443 (7th Cir. 2000)(Ripple, J. dissenting); *Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999)).

Here, the ALJ believed the record was incomplete in that the most recent evidence of Ms. Hargrave's treatment was more than 18 months old. Accordingly, she ordered Ms. Hargrave's counsel to request the more recent records from the emergency room visits

20

Ms. Hargrave described, and she ordered her to undergo a consultative examination, which she did. And the ALJ relied most heavily on the report of this examination, as well as the report of the other doctor who actually examined Ms. Hargrave. The ALJ may not have specifically examined the x-rays, but, having now reviewed the radiology report, this Court finds them to be consistent with the narrative report prepared by Dr. Shermer.

Ms. Hargrave cites *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345 (7th Cir. 2005) to support her argument that the ALJ's failure to wait for x-rays is grounds for remand. In that case, the Seventh Circuit remanded the case because the ALJ had mentioned at the hearing that he would look for a particular piece of evidence, but then he issued a decision without ever mentioning the outcome of his search; this was particularly troubling to the court because the piece of evidence in question was considered by a prior ALJ and the claimant's doctor to be crucial in determining the progression of the claimant's disability. *Id.* at 355. The situation here is different; the ALJ asked for a consultative exam, any additional ER records and x-rays because she wanted current information about the claimant's condition (the most recent evidence in the file was more than a year and a half old at that point). Before issuing her decision, she obtained and reviewed an up-to-date consultative examination report and a current RFC that was

consistent with the previous RFC from Dr. Bordy. Ms. Hargrave
has offered nothing to suggest that the x-rays were "crucial" or,
indeed, that they would have added anything to Dr. Shermer's
narrative. In short, unlike the ALJ in *Briscoe*, the ALJ here
satisfied her burden of developing the record; the Court will not
second guess the ALJ's "reasoned judgment" that she had all she
needed to determine Ms. Hargrave's elegibility for benefits. Ms.
Hargrave's request to remand on this basis is denied.

## The ALJ's RFC Assessment

Ms. Hargrave next argues that the ALJ's RFC assessment was
confused; she claimed to give weight to certain assessments in
the record – namely, those completed by Dr. Bordy and Dr.
Shermer – and not to others – namely, Ms. Shawn's. Yet, Ms.
Hargrave argues, she seemed to adopt portions of the latter and
seemed to disregard portions of the former. For example, the ALJ
determined that Ms. Hargrave could "sit through a normal workday,
with typical breaks, as long as she may stand in place for a
minute or two after a continuous period seated of one hour."
Record at 64. Yet, according to Ms. Hargrave, Dr. Bordy found
that he ability to sit was significantly reduced. She claims
that these findings are inconsistent. *See* Memorandum in Support
of Plaintiff's Motion for Summary Judgment, p. 11.

What Dr. Bordy actually indicated, by writing the letter "C"
on the line for sitting, was that Ms. Hargrave was 20% to 50% in

22

her capacity for sitting. Record at 310. Similarly, Dr. Shermer found that she could sit "less than 6 hours in an 8-hour workday. Doing the math, Dr. Shermer said she could sit 75% of the workday, while Bordy said she could sit 50 to 80% of the workday; it's hard to say that these are inconsistent, or that they're inconsistent with the ALJ's determination that she could sit throughout the day with normal breaks, as long as she could shift around for comfort. The ALJ specifically noted that the ranges indicated by the consultative examiners were inexact, and she explained her finding by referring to the narrative reports as well. Her finding is supported by the evidence.

Having said this, it is true that the ALJ made findings that would seem to exceed the scope of what Drs. Bordy and Shermer thought Ms. Hargrave could do. For example, the ALJ determined that Ms. Hargrave could "only occasionally climb ramps or stairs"; yet, the only doctor to specifically mention ramps and stairs was Dr. Shermer and he opined that she should *never* climb them. The ALJ explained that she read the RFC form in conjunction with the narrative report though; and the report, especially when read with Dr. Bordy's report, which indicated a diminished ability to climb, but not a complete inability to climb, supports the ALJ's finding. Moreover, this finding is consistent with what Ms. Hargrave herself had to say on the subject: by her own admission, she had some ability to climb

stairs, though not much. *See* Record, p. 153 ("I can only climb 5 stairs before I have to rest.").

### The ALJ's Hypothetical to the VE

Next, Ms. Hargrave argues that the ALJ's hypothetical to the VE was incomplete in that it failed to take into account all of her conditions and limitations. She argues that, because the hypothetical was incomplete, the ALJ was wrong to rely on the VE's testimony in response to it. Specifically, Ms. Hargrave argues that the hypothetical posed to the VE did not include her inability to do repetitive pushing/pulling with foot controls and her need for a sit-stand option. *See* Memorandum in Support of Plaintiff's Motion for Summary Judgment, p. 12. And that appears to be the case.

Generally, an ALJ's hypothetical to a VE must include all of the limitations and restrictions supported by the medical evidence in the record. *See Coleman v. Astrue*, — F.3d —, No. 07-1729, 2008 WL 695045, at *3 (7th Cir. March 14, 2008)(citing *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004)). As Ms. Hargrave recognizes, there is an exception to this general rule: an incomplete hypothetical may be cured and the omitted limitations imputed to the vocational expert where the expert independently reviewed the record and was present during the hearing. *Id.* That was the case here. Before testifying about the substance of Ms. Hargrave's past employment, the VE testified

that she had reviewed the relevant material in the exhibit file and that she had been present during – and listened carefully to – Ms. Hargrave's testimony.   Record, p. 430.

Ms. Hargrave argues that the VE could not have learned about her need for a sit/stand option because that specific limitation was not introduced into the record until Nurse Practitioner Erin Shawn raised the issue, post-hearing, in her November 14, 2005 report.   That's not true.   First, Dr. Bordy mentioned in his October 15, 2004 narrative report – which was part of the exhibit file – that Ms. Hargrave's pain was aggravated by walking or sitting and that she needed to "constantly adjust her position to relieve herself from this pain."   Record at 311.   Additionally, at the hearing, Ms. Hargrave specifically testified that she frequently needed to shift her position, from standing to leaning and from sitting to standing, to ease her pain; indeed, she demonstrated this to the ALJ, and the VE was there to see it. See Record, pp. 424-425. Indeed, the VE specifically mentioned this need in her testimony; she testified that, in the course of an hour, an employee can "alter their posture for up to about ten minutes" and still be a suitable candidate for competitive employment."   Record, p. 435.

Ms. Hargrave's inability to perform repetitive tasks with her feet was also raised; Ms. Hargrave testified concerning her foot issues and the medical records pre-dating the hearing

documented weakness in her lower extremities, as well as her complaints of numbness in her feet. *See, e.g.*, Record, p. 228, 153. Accordingly, the Court finds that remand on this basis is not necessary.

### **Request for Sentence Six Remand**

Finally, Ms. Hargrave argues that this matter should be remanded pursuant to sentence six of 42 U.S.C. §405(g); specifically, she argues that medical evidence developed and compiled since the date of the hearing constitutes "new and material" evidence warranting remand. To secure a remand under sentence six of § 405(g), a plaintiff must show that "there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." For sentence six purposes, evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding"; evidence is "material" if there is "a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered." *See Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997)(citing *Sample v. Shalala,* 999 F.2d 1138, 1144 (7th Cir. 1993); *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).

On December 29, 2006, almost a year after the ALJ issued her decision and more than three months after the Appeals Council

denied review, Ms. Hargrave underwent an MRI of the lumbar spine. The Final Report from that procedure states as follows:

> [t]he lumbar vertebrae are grossly normal in statute. There are degenerative changes in the vertebral marrow at L4 to L5 and also L5 to S1. Disc degeneration is noted at L3/4 through L5/S1. There is cystic degeneration in the L4/5 disc. There are findings consistent with laminectomies at the L4/5 and L5/S1 levels. The distal cord and conus are grossly unremarkable. There is grade 1 retrolisthesis of L5 with respect to L4. Disc bulging is noted at L3/4, L4/5 and L5/S1. No definite focal disc herniation noted. Facet arthropathy is noted in the mid to lower lumbar spine. There is suggestion of some mild central canal stenosis at L4/5 and L5/S1; the AP diameter of the spinal canal is approximately 10 mm at these levels. The inferior aspects of the neural foramina are narrowed bilaterally at L4/5 and L5/S1 and to a lesser degree at L3/4.

*See* Final MRI Report, dated December 29, 2006 (attached to Plaintiff's Motion for Remand). Ms. Hargrave has not persuaded the Court that the MRI report from December 2006 was materially different from the MRI and radiology reports from 2001; certainly, she has not persuaded the Court that the 2006 MRI report would have changed the Commissioner's mind about awarding benefits. Accordingly, Ms. Hargrave's request for a sentence six remand is denied.

## Conclusion

For the reasons set forth above, the Court finds no error in the ALJ's RFC analysis and finds that the ALJ's conclusions and decision to deny benefits were supported by substantial evidence. Additionally, the Court finds that the post-decision evidence

submitted by Ms. Hargrave is not "material" as that term is defined for purposes of sentence six of §405(g). Accordingly, the Court grants the Commissioner's Motion for Summary Judgment [#30], and denies Plaintiff's Motion for Summary Judgment [#24].

Dated: April 16, 2008

ENTER:

_Arlander Keys_

ARLANDER KEYS
United States Magistrate Judge